

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-20-2009

# USA v. Jones

Precedential or Non-Precedential: Precedential

Docket No. 07-2798

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Jones" (2009). *2009 Decisions*. Paper 1271.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1271

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-2798

UNITED STATES OF AMERICA

v.

PRESTON JONES
a/k/a
Death

Preston Jones,
Appellant

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 2-03-cr-00844-023)
District Judge: Honorable Katharine S. Hayden

Submitted Under Third Circuit LAR 34.1(a)
January 27, 2009

Before:  SCIRICA, <u>Chief Judge</u>, AMBRO,
and SMITH, <u>Circuit Judges</u>

(Opinion filed: May 20, 2009)

Michael A. Baldassare, Esq.
Gibbons
One Gateway Center
Newark, NJ 07102-5310

Counsel for Appellant

George S. Leone, Esq.
Sabrina G. Comizzoli, Esq.
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102

Counsel for Appellee

---

OPINION  OF  THE  COURT

---

AMBRO, Circuit Judge

This appeal concerns Preston Jones's jury trial and conviction under the Violent Crimes in Aid of Racketeering Act ("VICAR"), 18 U.S.C. § 1959, and his sentence of 22 years' imprisonment. His conviction stems from his involvement with the Double II Bloods, an East Orange, New Jersey sect of a violent nationwide street gang known as the Bloods. In 2004,

2

after a two-year investigation, the Federal Bureau of Investigation arrested and charged over 40 Double II Bloods gang members and associates with various racketeering, drug, firearm, and violent-crime offenses. All of the gang members, except Jones, pled guilty and avoided trial.

Jones raises five challenges to his conviction and sentence on appeal: (1) the District Court abused its discretion in failing to restart jury selection after six co-defendants pled guilty during *voir dire*; (2) a rational jury could not have found beyond a reasonable doubt that an agreement to commit murder was the object of the charged conspiracy; (3) the Court improperly admitted unduly prejudicial evidence; (4) the sentence was procedurally unreasonable; and (5) it was substantively unreasonable.[1] Jones requests we vacate his conviction and remand for a new trial, or vacate his sentence and remand for resentencing. For the following reasons, we reject each of Jones's arguments and thus affirm the jury's conviction and the District Court's sentence.

## I. Background

The facts here are extensive, but we only discuss those directly pertinent to Jones. In 2000, when Jones was a teenager,

---

[1]The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

he joined the Double II Bloods with his friend Samuel Wright. As part of the gang's formal initiation process, he pledged that he would kill for the Bloods. The East Orange, New Jersey sect of the Bloods had approximately 30 to 50 members at any given time. Jones and Wright were low-ranking "foot soldiers," and sold heroin for the gang at a designated street corner in East Orange.

The gang structure was well-organized and included weekly meetings. At these meetings, senior-ranking members would discuss drug dealing and retaliating against other gangs, and members would pay weekly dues to purchase firearms and post bail for incarcerated gang members, among other things. In October 2001, at one such meeting, one of the gang's leaders designated Jones and Wright to carry out a retaliatory act of violence against members of a rival gang involved in stabbing a member of the Double II Bloods and selling drugs in its territory. As part of the gang's hierarchy, foot soldiers, like Jones and Wright, were required to follow the orders of more senior-ranking members. In doing so, particularly by committing acts of violence, a foot soldier could prove his loyalty and maintain or enhance his reputation and standing within the gang.

Jones and Wright were instructed to travel to a particular street where the rival gang members lived and to shoot whomever they saw. According to trial testimony of other gang members who attended that meeting, Jones and Wright were told

to "RIP" (*i.e.*, "Rest In Peace" or kill) their targets.  They received loaded firearms and were driven to the location by another gang member, Tyheed Parker, who was to verify that the shooting occurred as instructed.  When they reached the location, they saw several people standing on a porch.  From an adjacent alley, Wright shot at the porch at least two times and then Jones shot at least three times, although the first shot did not fire because he still had on the gun's safety.  A witness who heard the shots testified that he saw one man hit in the chest by the bullets.  The victim was in critical condition, but survived.  After the shooting, Jones and Wright were lauded by other gang members for their actions.

Jones was arrested in 2004.  He was charged with other Double II Bloods in a Third Superseding Indictment.  After a jury trial, he was convicted under VICAR of three counts of racketeering: conspiracy to commit murder and attempted murder, both in violation of 18 U.S.C. § 1959(a)(5), and assault with a dangerous weapon, in violation of § 1959(a)(3).  He was also convicted of possession and discharge of a firearm for a violent crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (iii).  All offenses stemmed from the October 2001 shooting described above.  After a jury convicted Jones on all counts, the District Court sentenced him to 264 months' imprisonment.

## II. *Voir Dire*

5

The first challenge Jones raises is to the jury selection process. He argues that the jury was tainted because of local publicity and information during *voir dire* related to his co-defendants, violating his Fifth Amendment due process right and Sixth Amendment right to an impartial jury. When *voir dire* began, Jones was one of seven co-defendants. Prior to the parties exercising their peremptory strikes, all of Jones's co-defendants pled guilty. Jones requested that the District Court strike the panel and restart the entire *voir dire* process with a new jury pool. He believed the jurors were prejudiced by the potential knowledge of the guilty pleas and the *voir dire* questions prior to the pleas that concerned violent crimes of other co-defendants and not Jones. At that point, the jury selection process had taken well over one month, the District Court had pre-qualified approximately 40 potential jurors out of a pool of approximately 360 based on a detailed questionnaire, the attorneys were deeply involved in the process of questioning jurors, and over 50% of the pool that had been dismissed for cause felt a bias towards gangs.

The Court denied the request, but recognized that it would need to proceed with several ameliorative, or "screening," instructions and make further inquiries of the remaining pool to ensure an impartial jury. To that end, it requested and received draft instructions from Jones. The Court instructed the potential jurors not to speculate why Jones was on trial alone. It also informed the jury that the case was narrowed to the specific racketeering charges against Jones, and instructed

that they disregard anything they heard or read about the charges against the co-defendants during *voir dire*, such as the multiple murder charges related to other defendants mentioned in the preliminary statement. Then it inquired whether any of the potential jurors had seen or heard news reports about the case. Following these actions by the Court, both sides were able to exercise their peremptory strikes.

The Sixth Amendment guarantees the right to be tried "by an impartial jury." U.S. Const. amend. VI. An "impartial *jury* consists of nothing more than '*jurors* who will conscientiously apply the law and find the facts.'" *Lockhart v. McCree*, 476 U.S. 162, 178 (1986) (emphasis in original) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)); *see also Smith v. Phillips*, 455 U.S. 209, 217 ("Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen."). Jones complains of a defect in the jury selection process known as *voir dire*. "*Voir dire* is conducted under the supervision of the trial court and is left to its sound discretion." *United States v. DePeri*, 778 F.2d 963, 971–72 (3d Cir. 1985) (citing *Ristaino v. Ross*, 424 U.S. 589, 594 (1976)). We will determine that a district court abused its discretion when a defendant "demonstrate[s] clearly that the jurors possessed 'such fixed opinions that they could not judge impartially the guilt of the defendant.'" *Id.* at 972 (quoting *Patton v. Yount*, 467 U.S. 1025, 1035 (1984)).

7

Our conclusion that the District Court did not abuse its discretion, such that Jones's constitutional rights were not infringed, is guided by the Court's extensive actions to ensure impartiality. Jones first argues that the potential jurors may have been unduly influenced by local news outlet reports concerning the co-defendants' guilty pleas. We believe that the Court's repeated instruction on this point and further questioning were sufficient.[2] *See United States v. Provenzano*, 620 F.2d 985, 995 (3d Cir. 1980) (stating that it is a rare case in which adverse pretrial publicity will create a presumption of prejudice that overrides the jurors' assurance that they can be impartial). Jones cannot establish that "those who actually served on his jury lacked a capacity to reach a fair and impartial verdict based solely on the evidence they heard in the courtroom." *Rock v. Zimmerman*, 959 F.2d 1237, 1253 (3d Cir. 1992) (citations omitted). This is particularly true because the news articles did not reference Jones. Even so, the Court dismissed one juror who had seen a newspaper article concerning the guilty pleas of his former co-defendants, and further ensured through direct questioning that any other jurors who had seen a news report could remain impartial. In any

---

[2]At the beginning of *voir dire*, the Court instructed the potential jurors to keep themselves "free from any outside influence in the media regarding criminal justice issues," specifically related to "stories about gangs." In its questioning after the co-defendants pled guilty, the Court repeated the instruction and asked if any of the potential jurors had "not followed that instruction."

8

event, if jury selection were restarted, Jones would have encountered this same issue with any new jury pool, which is not uncommon when a particular crime is newsworthy. *See, e.g.*, *DePeri*, 778 F.3d at 972 (finding that pretrial publicity did not prejudice defendants' case where there was no evidence of juror partiality). In that situation, the Court would have handled jury selection in the same manner it did here.

Furthermore, the Court's cautionary instruction to the potential jury regarding the absence of the co-defendants who pled guilty adequately reduced the risk of prejudice to Jones. We have come to similar conclusions when presented with this type of argument in our prior cases. *See, e.g.*, *United States v. Gambino*, 926 F.2d 1355, 1364 & n.7 (3d Cir. 1991) (finding no prejudice where the court instructed the jury not to infer anything from the co-defendant's absence after he pled guilty); *United States v. Panepinto*, 430 F.2d 613, 615 (3d Cir. 1970) (finding no prejudice when four of ten defendants pled guilty or had their trials severed). The cases cited by Jones to support a finding of prejudice and violation of the right to an impartial jury were more offensive situations, concerning the defendant directly, and thus are unpersuasive in this context. *See, e.g.*, *Gov't of the Virgin Islands v. Parrott*, 551 F.2d 553, 554 (3d Cir. 1977) (finding defendant denied right to fair trial when three of the jurors that convicted the defendant had also been on jury that convicted him less than one month earlier for possession of firearm); *Griffin v. United States*, 295 F. 437, 439 (3d Cir. 1924) (finding jury not impartial where newspaper

9

article read by jurors stated defendants had offered to plead guilty and confessed, but were rejected because the evidence against them was "so overwhelming").

We conclude the same regarding Jones's claim about the charges related solely to his co-defendants. The Court's limiting instruction to the potential jurors was sufficient. It listed the racketeering offenses and firearm offense that Jones was charged with and differentiated those from the other offenses connected to his co-defendants. Jones argues that the Court's instruction was insufficient because it did not indicate that all of his offenses were tied to one event. We don't view this omission as a defect in the instruction or an abuse of the Court's discretion. It accurately described each of the offenses charged against Jones in the Third Superseding Indictment, and although it could have included the date of the event in its description, it was not required to do more.

As for Jones's claim that the jury questionnaire tainted the jury pool, both parties were substantially involved in crafting it and even if jury selection began anew with Jones as the only defendant, it would not have been substantially different. As the Government points out, it appears only one question specifically referred to Jones's co-defendants. (It stated the case "involves allegations that some of the defendants were involved in a multiple-year narcotics distribution conspiracy," and then generally lists the other offenses, including "murder, attempted murder, murder conspiracy, [and] the illegal possession of

10

weapons.")  The references to these other offenses were not detailed and were corrected by the Court in its instruction to the potential jurors (as described above).  The questions referencing gangs were not solely related to the co-defendants, but also applicable to Jones's racketeering charges under VICAR.  On this issue alone, the Court estimated that approximately half of the jurors dismissed for cause could not be impartial "because of their attitudes and feelings and belie[fs] and opinions about folks who were in gangs."

The mere existence of former co-defendants charged with additional crimes during *voir dire* does not automatically taint the impartiality of the jury, particularly in light of the actions taken by the Court.  Given the nature of the charges against Jones and the evidence necessarily presented by the Government to prove its burden, any reasonably astute juror would have understood that Jones's crime was a part of a larger gang organization involved in violent and drug-related activities.  In fact, many potential jurors could not put aside their general prejudices against gangs and evaluate the case against Jones impartially.  The Court dismissed those jurors.  Under the requirements of VICAR, the Government must show at trial that Jones was a part of an enterprise engaged in violent racketeering offenses.  Re-impaneling a jury would not eliminate these obvious facts or the ability of a well-vetted and impartial juror to separate the offenses charged against Jones from those of his fellow gang members.

We recognize that perfect jury impartiality is unattainable. *See Smith*, 455 U.S. at 217 ("[I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."). Indeed, the District Court stated that "[t]here's never a perfect, perfect scenario." Certainly in every trial, no matter the charges, each juror brings to the proceedings his or her own experiences. Respecting this, we do not find an abuse of discretion where the District Court has exerted substantial effort in questioning potential jurors regarding their ability to be impartial and keep an open mind, particularly on specific issues, and instructed the jury as cautiously as was done here. *Cf. United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) (noting the "well-established presumption of juror impartiality . . . as well as the equally important presumption that jurors followed the trial court's instructions") (citations omitted). Moreover, Jones does not attempt to suggest that any particular juror was biased. Accordingly, we conclude that Jones's constitutional rights were not violated by the *voir dire* process.

## III. Proof of Conspiracy

The second claim Jones raises is a Fifth Amendment due process challenge to his conviction for murder conspiracy under VICAR, 18 U.S.C. § 1959(a)(5). He argues that no reasonable jury could have concluded that the Government proved the conspiracy beyond a reasonable doubt. The District Court rejected this argument when Jones moved for judgment of

12

acquittal under Federal Rule of Criminal Procedure 29 after trial. We conclude the same.

We apply the same standard as the District Court in reviewing the question whether a rational jury could have found the elements of the offense beyond a reasonable doubt. *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998). Our standard is highly deferential. *Id*. We do not weigh the evidence or determine the credibility of the witness. Rather, we "view the evidence in the light most favorable to the Government, . . . and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal citation omitted).

Jones argues that the Government failed to prove an agreement to commit murder as the object of the conspiracy. The jury convicted Jones under the VICAR statute for conspiring to commit murder for the "purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a)(5). VICAR was enacted by Congress in 1984 as a violent crime corollary to the RICO statute.[3] VICAR provides penalties for

---

[3]RICO, otherwise known as the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1963, was enacted in 1970 and intended to be used to prosecute the Mafia as well as others who were actively engaged in organized crime; its application has become more widespread, also covering other business organizations. RICO defines "racketeering activity"

similar crimes set forth in RICO, such as murder, assault, kidnapping, and threats made in connection with a racketeering enterprise. *Id.* § 1959(b)(1) ("'racketeering activity' has the meaning set forth in [RICO, 18 U.S.C. §] 1961 of this title").

In viewing the evidence in the light most favorable to the Government, this claim fails. Four gang members testified against Jones, including Wright and Parker, both of whom were directly involved in the October 2001 incident. They testified that the purpose of the October meeting was to select members to carry out the violent act of retaliation against the rival gang for the stabbing of a Double II Bloods' member. According to the trial testimony, Jones and Wright were dispatched "[t]o kill" or "RIP meaning 'rest in peace' them." The gang's leaders directed Jones and Wright to a particular street corner in East Orange and supplied them with loaded guns. Parker was also sent to confirm that the shooting took place as ordered. As a Double II Bloods' foot soldier, Jones was required to follow the orders of senior members and had sworn to kill for the gang during his initiation. Given this overwhelming evidence, we conclude a rational jury could have found all elements of the murder conspiracy charge beyond a reasonable doubt.

---

broadly, including violations of state statutes against gambling and extortion to securities fraud and acts of terrorism. § 1961(1). An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union group or individuals associated in fact although not a legal entity." § 1961(4).

14

## IV.  Rules 401 and 403

Jones's third challenge concerns Federal Rules of Evidence 401 and 403.  He argues that the District Court erred by admitting irrelevant and prejudicial evidence well beyond the scope of his racketeering charges.  Thus, he requests that his conviction be vacated and the case remanded for a new trial.

Jones filed a pre-trial motion *in limine* objecting to certain categories of evidence under Federal Rules of Evidence 401, 402, 403, and 404(b).  At that time, the District Court denied the motion on all grounds except that it reserved ruling on Rule 403 until the evidence was presented during trial and the Court could contemporaneously balance the probative value against the danger of unfair prejudice.[4]  Jones also filed a post-trial motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, claiming unfair prejudice under Federal Rule of Evidence 403.  The District Court denied this motion.

On appeal, Jones claims that certain categories of evidence presented by the Government at trial related only to the broad time frames and the counts against his former co-

---

[4]Federal Rule of Evidence 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

defendants, yet were improperly let in by the District Court "under the guise of proving the 'enterprise' and 'racketeering activity' elements of the VICAR charges against [him]." Appellant's Br. at 7. Essentially, he contends that this evidence is not relevant under Rule 401. In arguing that the evidence is also "unduly prejudicial," Jones claims the proofs should have been tailored to a "much more narrow time frame," specifically tied to the events in October 2001. *Id.* He lists eight categories of evidence introduced by the Government as irrelevant and prejudicial: (1) the 2000 murder by a senior leader of the Double II Bloods, including a photograph and expert testimony regarding the autopsy; (2) the brutal face slashing of a Double II Bloods' gang member by another member while in jail, ordered by a senior gang leader; (3) the recovery of an abandoned Cadillac in East Orange in 2000 containing a gun, heroin, and cocaine; (4) testimony about a heroin conspiracy involving the Double II Bloods, including frequent trips to New York City to purchase drugs in 2000; (5) testimony about a gun-trafficking conspiracy involving the Double II Bloods in 2002, including firearms put into evidence; (6) testimony concerning at least three other shootings involving rival gangs; (7) information about the Bloods' history dating back to 1993; and (8) information about gang-related clothing, graffiti, and hand signals.

The District Court's decision to admit evidence pursuant to Federal Rules of Evidence 401 and 403 is reviewed for abuse of discretion. *United States v. Hans*, 738 F.2d 88, 91 (3d Cir.

16

1984) (citing *United States v. Dalfonso*, 707 F.2d 757, 762 (3d Cir. 1983)). Where a court defers its decision on a motion *in limine* and the defendant fails to renew his objection during trial, the review is for plain error. *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 520 (3d Cir. 1997) (citing Fed. R. Evid. 103(a)).

The Government argues that we should apply a plain error standard of review to Jones's Rule 403 challenge because he only raised his objections pre- and post-trial, but failed to object to each category of evidence during trial. It made the same argument to the District Court during a hearing on the post-trial motions, specifically referring to "the Blood beads and the bandana and the photographs of young men standing round wearing red," which Jones did not object to at trial and "came in through consent." The Court rejected this argument, noting that it and the parties were vigilant about Rule 403 issues throughout the trial (thus creating a continuing objection), and that a specific objection on each issue was not necessary. Rather than dive into this thorny question to determine the appropriate standard of review for each category of evidence, we believe that the District Court did not abuse its discretion, and thus satisfies this higher standard of review.

Turning to the substance of Jones's claims, the statutory language of VICAR is broad, in that it covers violent crimes that might otherwise be prosecuted by local authorities. A violation under this statute has five elements: (1) there was an "enterprise," (2) that engaged in "racketeering activity," (3)

17

affecting interstate or foreign commerce (jurisdictional element), (4) and the defendant committed a crime of violence, (5) "for the purpose of gaining entrance to or increasing or maintaining his position in the enterprise." 18 U.S.C. § 1959(a); *see also United States v. Banks*, 514 F.3d 959, 964 (9th Cir. 2008). Jones contends that these elements restrict the Government's evidence to what is directly tied to the October 2001 shooting, and the question turns on "just how much 'enterprise' and 'racketeering' activity evidence is permitted." Appellant's Br. at 37.

Similar to RICO, a VICAR "'enterprise' includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2). This expansive definition must have three characteristics: "a common purpose shared by the individual associates; some continuity of structure and personnel; and structure distinct from that inherent in the racketeering activity alleged." *United States v. Crenshaw*, 359 F.3d 977, 991 (8th Cir. 2004) (citation omitted); *see also* U.S. Attorney's Manual § 9-110.812(C) ("Organized Crime and Racketeering"). The Seventh Circuit Court of Appeals has said that "[i]t is difficult to comprehend how one could prove the existence of an enterprise comprised of a group of individuals associated in fact, and organized solely for the purpose of committing crimes, without presenting evidence of the crimes that detail the structure, common purpose, and continuity of the charged enterprise." *United*

18

*States v. Salerno*, 108 F.3d 730, 739 (7th Cir. 1997) (internal quotations omitted). Not surprisingly, to prove this element in a VICAR case, courts have sanctioned evidence of other crimes committed by members of the organization and not the defendant. *See, e.g.*, *United States v. Brady*, 26 F.3d 282, 285–88 (2d Cir. 1994); *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991); *see also United States v. DiSalvo*, 34 F.3d 1204, 1221 (3d Cir. 1994) (allowing evidence of uncharged acts to prove existence of an enterprise and racketeering in RICO context). In addition, the Government must prove there is a "nexus between the enterprise and the crime of violence" and the "defendant's relationship to the enterprise." U.S. Attorney's Manual § 9-110.815.

Jones's charges derive from a large-scale multi-year investigation of the East Orange Double II Bloods involving over 40 gang members. All of Jones's fellow gang members pled guilty to various racketeering, drug, and violent crime offenses, leaving Jones as the sole defendant standing trial. Clearly the Government devoted substantial time and resources in developing its case because a trial with seven co-defendants required presentation of an extensive amount of evidence. When Jones became the only defendant, however, the Government took steps to pare down this evidence. As a result of the Government's winnowing, a trial expected to last up to six months was reduced to five full days of testimony. At the post-trial hearing, the Government noted that, of the 20 witnesses who testified at Jones's trial, 16 testified about the

19

events of October 2001.

At the outset, we quickly dispose of Jones's Rule 401 challenge. As a general rule, "all relevant evidence is admissible." Fed. R. Evid. 402. Evidence is "relevant" if its existence simply has some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence encompasses a broad scope of proof, particularly here, where the Government bears the burden of proving beyond a reasonable doubt all five of VICAR's elements, including "enterprise" and "racketeering activity." The Court took great care in considering and ruling on Jones's motion *in limine*. In denying the pre-trial motion based in part on Rule 401, the Court stated:

> [T]he Government has a fairly dramatic amount of story to tell in order to meet the requirements of VICAR, resting as they do in the requirements of RICO, because, in fact, what the Government is doing is using a statute that takes what appears to be an isolated incident of a state crime nature and puts it in a larger context, makes it Federal, and punishes it according to Federal law.

We do not agree with Jones's argument that any testimony regarding events after the October 2001 shooting is irrelevant. The facts related to post-2001 events stem from the

overarching gang enterprise and racketeering activity prior to 2001. In this context, we cannot say that this evidence was not relevant. Thus, we do not believe the District Court abused its discretion in denying Jones's motion.

Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. As to Jones's motion *in limine*, the Court reserved judgment on the question of prejudice under Rule 403 and recognized that determining where to "draw the line" was a tough call. In denying his motion for a new trial based on prejudice, the Court explained the process throughout trial and why it was denying the motion. The Court stated that "the [G]overnment responded to the 403 elements of the prejudic[e] arguments very specifically by tailoring this case with great rigor to a focused environment[,] . . . . arguably[] less than 25 percent on the enterprise." It found the prejudice argument "not persuasive because of the vigilance with which all sides met the challenge early on," and that "at every proper and reasonable point in the case when the [prejudice] argument could be made" there was a sidebar discussion. Some evidentiary rulings "went in favor of the prosecution and some of them went in favor of the defendant."

The cases Jones cites in support of his argument are unpersuasive in this context. *United States v. Murray* concerned minimally probative, but highly prejudicial, evidence of an uncharged murder the defendant allegedly committed years

21

before while on trial for another murder in furtherance of a continuing criminal enterprise. 103 F.3d 310, 315–16, 319 (3d Cir. 1997) (charging defendant under 21 U.S.C. § 848 for "intentional killing in furtherance of a continuing criminal enterprise" and drug offenses). We concluded that the evidence "'weigh[ed] too much with the jury and . . . so overpersuade[d] them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge.'" *Id.* at 320 (alteration in original) (quoting *United States v. Sampson*, 980 F.2d 883, 886 (3d Cir. 1992)). Similarly, *United States v. Hans* dealt with evidence from an FBI agent who testified that the defendant, who was on trial for bank robbery and assault, was well known to the local authorities as a bank robber. 738 F.2d 88, 95–96 (3d Cir. 1984). We determined that this testimony was unnecessary to prove the crime and highly prejudicial because it left the jury with the "indelible impression that . . . [the defendant] was a professional bank robber." *Id.* at 94.

We based our decisions in *Murray* and *Hans* on evidence of serious crimes and character directly connected to each defendant, yet unnecessary for the Government to prove its case on the elements of the specific charged crime. Here, as we stated in discussing Jones's Rule 401 challenge, the gang-related evidence Jones complains of went to proving the VICAR offenses, specifically the expansive elements of "enterprise" and

"racketeering activity."[5] Jones was proven to be a member of the gang, but in each of the evidentiary categories he lists, he was not directly implicated in the violent crimes and other racketeering activities of the gang. *See, e.g.*, *Brady*, 26 F.3d at 285–88 (discussing that evidence of murders the defendants had not committed was relevant under VICAR and was not "unduly prejudicial" because "there was no suggestion that the defendants committed any of the murders at issue"); *Coonan*, 938 F.2d at 1561 (stating that the defendant was not "unfairly prejudiced" by evidence of "gruesome murders and dismemberments" committed by other gang members that was "probative of the existence of the charged enterprise" under RICO and VICAR).

Therefore, unlike *Murray* and *Hans*, we do not believe

---

[5]For example, the evidence related to the slashing of another Bloods' member and the other shootings tended to show the gang's hierarchal structure and expectations that lower-ranking members, such as Jones, carry out the violent acts of retaliation, including murder, against other gangs to ensure one's position within the Bloods, solidify its violent reputation, and protect its drug-distribution territory from rival gangs, among other things. Also, evidence related to drug and gun trafficking connected the enterprise to the interstate commerce element and connected Jones's drug dealing activities within the gang and the gun given to him to use in the October 2001 shooting to the ongoing racketeering activities of the enterprise of which Jones was a member.

the evidence overwhelmed the jury and prejudiced their judgment concerning the specific charges against Jones in this case. While some degree of prejudice arguably results from any presentation of violent crime and drug evidence, in this instance we do not believe the Court abused its discretion in light of the requirements under VICAR by admitting the challenged evidence at trial.[6]

## V. Sentencing

The last two challenges Jones raises concern the procedural and substantive reasonableness of his sentence.[7] Following the Supreme Court's decision in *United States v.*

---

[6]The District Court stated that its "mantra" throughout trial had been "403, 403, 403, let's be aware of it," and indicated that throughout the case that prejudice was the "foghorn that's been blown again and again and again," recognizing that it had to determine where to "draw the line."

[7]Jones also claims the District Court violated his Fifth and Sixth Amendment right to a jury trial by engaging in improper fact-finding to trigger the ten-year statutory mandatory minimum sentence for discharging a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(iii). He concedes, however, that we foreclosed this claim in *United States v. Williams*, 464 F.3d 443, 449 (3d Cir. 2006) (affirming statutory mandatory minimum sentence based on district court's finding that defendant discharged firearm), and thus merely preserves this argument for further review purposes.

*Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are now advisory. *See Gall v. United States*, 128 S.Ct. 586, 594 (2007). We review a sentence under a deferential "abuse of discretion" standard. *Id.* "[O]ur role is two-fold. We must first ensure that the district court committed no significant procedural error in arriving at its decision." *United States v. Wise,* 515 F.3d 207, 217 (3d Cir. 2008). Examples of procedural errors include "'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" *Id.* (quoting *Gall*, 128 S.Ct. at 597). With respect to the applicable § 3553(a) factors, the court need not "discuss and make findings as to each of [them] if the record makes clear [it] took the factors into account in sentencing" and gave them "meaningful consideration." *United States v. Cooper*, 437 F.3d 324, 329 (3d Cir. 2006) (internal citations omitted). Instead, a sentencing judge "'should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority.'" *United States v. Lessner,* 498 F.3d 185, 203 (3d Cir. 2007) (quoting *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2468 (2007)).

If we conclude that a court committed no procedural error, we then review the substantive reasonableness of the sentence. "As long as a sentence falls within the broad range of possible sentences that can be considered reasonable in light of

the § 3553(a) factors, we must affirm." *Wise*, 515 F.3d at 218 (citation omitted).

First, Jones argues that his sentence is procedurally unreasonable because the District Court never formally ruled on his motion for a downward departure based on overstatement of his criminal history. Prior to sentencing, both parties fully briefed this issue. The Government conceded the possibility of a departure in its brief, but argued that the Pre-Sentence Report (the "PSR") prepared by the Probation Office accurately reflected Jones's criminal history. The PSR recommended a criminal history category of V, while Jones argued for II. The Court adopted the PSR's recommendation at the sentencing hearing.

We continue to treat "discretionary denials of departure motions in calculating sentencing ranges" the same as we did pre-*Booker*. *United States v. Jackson*, 467 F.3d 834, 839 (3d Cir. 2006). "We do not have jurisdiction to review discretionary decisions by district courts to not depart downward." *United States v. Vargas*, 477 F.3d 94, 103 (3d Cir. 2007).

Although the Court did not explicitly deny Jones's motion, it was fully informed on the issue and did not grant his requested departure. There is nothing in the record to indicate that the Court was acting under the "mistaken belief that it lack[ed] the discretion" to reduce the criminal history category under the evidence before it. *Id.* ("Jurisdiction [to review the

26

denial of a departure] arises . . . if the district court's refusal to depart downward is based on the mistaken belief that it lacks discretion to do otherwise."). Indeed, the Government conceded the plausibility of a departure. *See Jackson*, 467 F.3d at 839 (stating that even where the court did not explicitly rule on the departure motion, "we would not remand for re-sentencing when the Government's arguments to the district court 'concede[d] the plausibility of the downward departure'") (alteration in original) (citation omitted). Thus, to the extent Jones challenges the Court's discretionary decision not to reduce his criminal history category of V when the evidence before the Court—specifically his two prior convictions related to his drug dealing for the gang—supports the PSR's recommendation, we will dismiss this argument for lack of appellate jurisdiction.

Jones also claims that his sentence is procedurally unreasonable because the District Court did not adequately consider the disparity between his sentence and his co-defendant, Wright, under 18 U.S.C. § 3553(a)(6) ("the need to avoid unwarranted sentence disparities among" similarly situated defendants). This argument, while plausible, is ultimately unconvincing. Wright was the second shooter in the October 2001 incident from which Jones's charges stemmed. Indeed, there is an 18-year disparity between Wright's sentence of 48 months' imprisonment and Jones's of 264 months' imprisonment. The Court, however, gave "meaningful consideration" to this disparity, noting that Wright and Jones were not similarly situated in all respects. *See Wise*, 515 F.3d

27

at 217; *Cooper*, 437 F.3d at 329. Unlike Jones, Wright took substantial ameliorative actions, which were later reflected in his lower sentence. He pled guilty, accepted responsibility for his actions, denounced his gang affiliation with the looming threat of violent retaliation, and substantially cooperated with the Government, in part by testifying at Jones's trial.

The Court instead likened Jones to several of his other co-defendants who pled guilty and received sentences between 15 and 34 years' imprisonment. In fact, the Court granted him a 44-month downward variance from the bottom of the recommended Guidelines range "[t]o achieve [an] appropriate balance among sentences." Jones was the last to be sentenced and the Court stated that "[p]eople were sentenced to what was deemed to be by this Court the right amount of time under all of the circumstances." Accordingly, the Court did not err in its consideration of the § 3553(a) factors applicable to Jones.

Finally, Jones argues that his sentence is substantively unreasonable. This claim is also unpersuasive. The District Court extensively discussed the reasons underlying his below-Guidelines sentence. The sentence was long, but it was connected to the seriousness of the crime and the "awful societal impact" of the gang on East Orange. The Court noted that the Double II Bloods had turned the city into a "war zone." In particular, the randomness of Jones's actions that "savagely wounded" an innocent person demonstrated that he "didn't care who got hit." It pointed out that even after Jones's first round

28

did not fire because the gun's safety was still on, he removed it and continued to shoot at least two more live rounds. On balance, it also took into account the support of his family and that he was only 18-years old at the time of the shooting. It granted the 44-month variance because Jones was young and "worth saving." Consequently, there is no question the sentence was reasonable.

* * * * *

For these reasons, we affirm Jones's jury conviction and the District Court's sentence.