NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2187
_____

CAROL A. SULLIVAN; BRUCE SULLIVAN, Individually and/or as
Co-Administrators of the Estate of Sean P. Sullivan, Deceased,
Appellants.

v.

WARMINSTER TOWNSHIP; WARRINGTON TOWNSHIP;
MICHAEL MURPHY; JAMES J. MILLER; JAMES MCCAFFREY;
DANIEL LEPORACE; CHRISTOPHER SPRINGFIELD; SEAN HAROLD;
RON SZYMBORSKI; CASEY BYRNE; JOHN BLANCHARD; QUENTIN FULLER,

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 07-cv-4447)
District Judge:  Hon. R. Barclay Surrick

_____

ARGUED
January  10, 2012

Before:  FUENTES, JORDAN, and NYGAARD, *Circuit Judges*.

(Filed: February 6, 2012 )

_____

Jason P. Grosselin
Richard M. Haggerty, Jr.
Elizabeth L. McLachlan
William M. McSwain   [ARGUED]
Andrew P. Reeve
Drinker, Biddle & Reath
18th & Cherry Streets
One Logan Square - #2000
Philadelphia, PA  19103
        *Counsel for Appellants*

Christopher P. Boyle, Sr.
Charles W. Craven     [ARGUED]
Joseph J. Santarone,  Jr.
Marshall, Dennehey, Warner, Coleman & Goggin
620 Freedom Business Center - #300
King of Prussia, PA   19406
        *Counsel for Appellees, Warminster Township,*
        *Michael Murphy, James McCaffrey, Daniel Leporace,*
        *Christopher Springfield, Sean Harold, Ron Szymborski,*
        *and Casey Byrne*

Wendi D. Barish
Joseph Goldberg
Jamie L. Panzer
Syreeta J. Peake   [ARGUED]
Weber, Gallagher, Simpson, Stapleton, Fires & Newby
2000 Market Street - #1300
Philadelphia, PA   19103
        *Counsel for Appellees, John Blanchard,*
        *Township of Warrington, James J. Miller,*
        *and Quentin Fuller*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This case arises out of a confrontation between Sean Sullivan ("Sean") and police officers from Warrington and Warminster Townships in Pennsylvania that resulted in

Sean's death.[1] Sean's parents, Carol Sullivan ("Carol") and Bruce Sullivan (collectively

"Plaintiffs") brought claims, individually and as administrators of Sean's estate, under 42

U.S.C. § 1983 and Pennsylvania common law, alleging that the police officers used

excessive force during their attempt to arrest Sean. After a twelve-day trial, the jury

determined that the officers did not use excessive force, and the District Court entered

judgment in favor of the officers and the townships. Plaintiffs appeal that judgment,

arguing that the District Court abused its discretion by refusing to allow them to cross-

examine one of the arresting officers regarding a pistol which Plaintiffs claim the officers

planted as evidence on the day Sean was killed. They also say the Court should have

allowed cross-examination about a police log that contained reports sent by the officers to

police dispatchers during the attempt to arrest Sean. For the following reasons, we will

affirm.

## I.    Background[2]

### A.    *Carol's Arrest  and Sean's Death*

Early in the morning of March 31, 2006, police officers from Warminster

Township went to the Sullivan home to serve Sean's mother, Carol, with an arrest

---

[1] We will be speaking about different members of the Sullivan family and so will use their first names for ease of reference, intending no undue familiarity or disrespect. The defendants in this case are: Warminster Township; Warrington Township; Michael Murphy; James J. Miller; James McCaffrey; Daniel Leporace; Christopher Springfield; Sean Harold; Ron Szymborski; Casey Byrne; John Blanchard; and Quentin Fuller. We refer to them collectively as "Defendants."

[2] Because Plaintiffs appeal a jury verdict, "we state the facts in the light most favorable to the prevailing party [at trial] … based on the evidence introduced at trial." *Eshelman v. Agere Sys.*, 554 F.3d 426, 430 n.2 (3d Cir. 2009) (citing *Johnson v. Campbell*, 332 F.3d 199 (3d Cir. 2003)).

warrant for several nonviolent misdemeanors. At the same time, the officers sought to question her about Sean's involvement in a string of armed robberies in Warminster. When the officers arrived at the house and knocked on the door, they heard noises inside but did not get an immediate response. Eventually, Carol answered the door and the officers informed her that they had a warrant for her arrest. Rather than complying with the officers' requests for her surrender, however, Carol retreated into the house and resisted arrest. The officers followed her, placed her in handcuffs, and asked her where they could find Sean. According to one of the arresting officers, Carol immediately "lost the color in her face and started to go white as if she became scared," as she looked towards a bedroom. (App. at 1973.) At about that time, the officers heard Sean shout, "I have a gun." (*Id.*)

Because Sean was in a bedroom with the door closed and was yelling that he had a gun, Officer Harold of the Warminster police immediately reported over the police radio that he had encountered an armed, barricaded suspect and had set up a security perimeter in the front and back of the Sullivan residence. As the law enforcement officers assumed their posts, Officer Harold called to Sean and told him to come out the front door. Sean, however, refused to obey those commands and eventually climbed out a rear window.

According to three of the officers at the scene, Sean immediately pulled a gun from his waistband when he hit the ground. Two officers testified that he pointed the gun directly at them. Believing that he posed a direct threat to their safety, those officers and several others fired approximately 55 rounds in Sean's direction, six of which hit him and

4

caused him to fall. After he fell, the officers provided him with medical aid, but, despite their efforts, Sean died from his gunshot wounds.

At some point after the shooting, the police officers recovered from the Sullivans' backyard what they described as a "[b]lack Walther PPKS BB caliber pistol," which they believed was the same gun that Sean possessed when he went out the rear window. (App. at 3357.) The officers reported the gun over the police radio, and their report was recorded in a dispatch log. The log entry, which states, "@ 6:53 HRS RECOVERED A FIREARM," was recorded at approximately 7:12:54 a.m. (App. at 3420.) There is no evidence in the record of who created the log entry or why that individual recorded the discovery of the firearm at 7:12:54 a.m.

B. *Eric Yuetter's Pellet Gun*

Approximately two weeks before Sean's death, Officer Harold and another police officer questioned an individual named Eric Yuetter in connection with the Warminster robberies. During that meeting, the officers confiscated a "black plastic HFC pellet gun," which they marked as evidence to be destroyed. (App. at 3361.) Later, during discovery, a police report pertaining to that confiscation was provided to the Plaintiffs. Evidently concerned that Plaintiffs would try to argue that the pellet gun taken from Yuetter was planted as evidence in the Sullivans' yard, Defendants filed a motion *in limine* to prevent Plaintiffs from calling Yuetter as a witness to testify about "the confiscation of his black pellet gun." (App. at 598.) Defendants argued that the District Court should preclude Yuetter from testifying because Plaintiffs had failed to identify him as a witness in their initial discovery disclosures, as required by Federal Rule of Civil Procedure 26. The

5

District Court denied the motion as moot, because Plaintiffs indicated they could not find

Yuetter and so no longer intended to call him as a witness.

C. *The Trial*[3]

During trial, Plaintiffs sought to cross-examine Officer Harold concerning the

dispatch log entry which stated that police officers recovered a firearm at the Sullivan

residence at 6:53 a.m. The Court precluded that line of questioning, however, reasoning

that Officer Harold could not testify to the accuracy of the dispatch log because he had no

personal knowledge of its contents or how that specific entry was created.[4] Plaintiffs did

not attempt to authenticate the log.

---

[3] Though the Complaint originally set forth additional claims, the parties went to trial on the following: (1) Plaintiffs' § 1983 excessive force claim against Defendants Blanchard, McCaffrey, Harold, and Leporace (Count I); (2) Plaintiffs' § 1983 municipal liability claim against Warminster Township (Count IV); and (3) Plaintiffs' intentional infliction of emotional distress claim against Defendants Blanchard, McCaffrey, Harold, and Leporace (Count IX).

[4] When Plaintiffs attempted to cross-examine Officer Harold concerning the disputed log entry, the following colloquy ensued:

> [Plaintiffs' counsel]: Now that the radio tape is in I want to show them the log and show discrepancies between what we heard and what's in the book.
>
> The Court: All right, but you'll have to get somebody to identify it.
> …
>
> [Plaintiffs' counsel]: In that case I would want to add that I have an interest in, I just want to cross-examine [Officer Harold] about some things that –

During cross-examination, Plaintiffs also asked Officer Harold whether he had confiscated any "black pellet guns" during his investigation of the Warminster robberies. (App. at 3011.) In response, Officer Harold stated that he had not confiscated any "bebe pistols" during the robbery investigation. (*Id.*) Plaintiffs then attempted to question Officer Harold regarding the pellet gun that was confiscated when police officers questioned Yuetter on March 14, 2006. However, the District Court precluded Plaintiffs from pursuing that line of inquiry. The Court concluded that Yuetter's pellet gun was irrelevant because Plaintiffs had failed to establish that it was the same gun that the officers allegedly placed on the Sullivan property on March 31, 2006. (*See* App. at 3013-14 ("[The Court]: One of the theories of the case is that the gun was planted … but, you're trying to prove that on another occasion, this officer found a different gun.").)

---

The Court: Well, you're not going to make statements like the log says this and the log says that and ask him questions about it, counsel.
…

The Court: Counsel, when this log was created, you objected to its use and now you're try[ing] to cross-examine based on it and there's nobody here to give any testimony with regard to how it was created and what it represents.
…

The Court: Counsel, you can question him with regard to his testimony but if you're going to try to use the log, you're not going to refer to it and say the log says this and the log says that because that log has not been properly identified.

(App. at 3005-3006.)

7

After a twelve-day trial, and following a jury verdict, the District Court entered judgment in favor of Defendants. This appeal followed.

## II. Discussion[5]

Plaintiffs argue that the District Court abused its discretion by limiting the scope of cross-examination concerning the dispatch log and the confiscation of Yuetter's pellet gun. We address those arguments in turn.

### A. *The Dispatch Log*

Plaintiffs' first contention is that the District Court erred in refusing to allow them to ask Officer Harold why the log entry, noting that a firearm was found at the Sullivan residence,[6] was not recorded at the time the officers recovered the gun. They assert that the District Court wrongly concluded that Officer Harold had no personal knowledge of the contents of the log, and they point out that he had previously "testified to the process by which the [dispatch] log [was] generated." (Appellants' Opening Br. at 60.) Moreover, Plaintiffs contend that "Officer Harold was the most – perhaps the only –

---

[5] The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343. We have jurisdiction pursuant to 28 U.S.C. § 1291, and review the District Court's ruling regarding the scope of cross-examination and whether to admit evidence for abuse of discretion. *See United States v. Johnson*, 302 F.3d 139, 152 (3d Cir. 2002) (evidence); *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991) (cross-examination).

[6] As previously noted, the dispatch log stated that the police officers discovered a "firearm" at approximately 6:53 a.m. at the Sullivan residence. Although the term "firearm" is subject to more than one meaning, *see Merriam Webster's Collegiate Dictionary* 437 (10th ed. 2002) (defining "firearm" as "a weapon from which a shot is discharged by gunpowder"); *Black's Law Dictionary* 666 (8th ed. 2004) (defining "firearm" as "[a] weapon that expels a projectile (such as a bullet or pellets) by the combustion of gunpowder or other explosive"), it is undisputed that, in this case, the term as used in the log entry refers to either a pellet gun or a BB gun.

8

qualified witness to explain the 19-minute gap" between 6:53 a.m., when a police officer supposedly discovered the firearm, and 7:12:54 a.m., when the discovery was recorded in the dispatch log. (App. at 61.) Defendants counter that "the cross-examination of Officer Harold regarding documents he did not create would have been improper lay witness opinion since Officer Harold had no first hand [sic] knowledge as to how the documents were created." (Appellees' Opening Br. at 42.)

It is well-settled "that a party is guaranteed only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the [party] might wish." *Douglas v. Owens*, 50 F.3d 1226, 1230 (3d Cir. 1995) (internal quotation marks and citation omitted). Thus, when deciding whether to allow cross-examination, a "district court is required to strike a balance between the opportunity to cross-examine and the need to prevent repetitive or abusive cross-examination." *Id.* (citing *United States v. Casoni*, 950 F.2d 893, 919 (3d Cir. 1991)). One of the things a district court may consider is whether the witness is competent to answer the questions being posed. *See United States v. Scales*, 594 F.2d 558, 561 (6th Cir. 1979) (holding that trial court did not err in limiting the scope of cross-examination when a "witness … stated at the outset of cross-examination that he lacked personal knowledge … and was therefore not competent to answer the question").

The District Court did not abuse its discretion by precluding Plaintiffs from cross-examining Officer Harold regarding the contents of the dispatch log, because Plaintiffs failed to establish that Harold had firsthand knowledge of the contents of the log or how the entry in question was created. Under Federal Rule of Evidence 602, "[a] witness may

testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Here, the only evidence Plaintiffs offered in support of their assertion that Officer Harold had firsthand knowledge of the disputed log entry is the fact that, during trial, he described generally how the police radio system operates in Bucks County, and he said that radio dispatchers in Bucks County typically record each radio transmission from police officers in a log:

> There would be a log. Not a log that I would keep, however[.] [W]hen you radio into dispatch, dispatch will take notes in what they call a CAD, which is a computer animated display, which is where the radio goes through.
>
> So as they assign units out there, there would be a log that says 74-N arrived on scene and then the time would automatically be generated – I believe it's automatically generated by the CAD. And then the dispatchers have the option of entering notes, if they have time to do that.

(App. at 3004.) That testimony, however, does not suggest that Officer Harold had personal knowledge of the contents of the log created on March 31, 2006, or why the individual who created the log that day recorded the discovery of the firearm at the Sullivan residence at 7:12:54 a.m. instead of 6:53 a.m. Instead, Officer Harold's testimony merely demonstrates that he knew the log process generally and that the dispatch "[had] the option of entering notes" into a log "if they [had] time to do that." (*Id.*) Nor is there any other evidence indicating that Officer Harold had personal knowledge of the contents of the log. Thus, because Plaintiffs failed to lay a proper foundation for cross-examining Officer Harold about the contents of the dispatch log and

10

how it was created, the District Court did not abuse its discretion by preventing that cross-examination.[7]

B.    *The Confiscation of Yuetter's Pellet Gun*

Plaintiffs also argue that the District Court abused its discretion by refusing to allow them to cross-examine Officer Harold regarding the confiscation of Eric Yuetter's pellet gun. In support of that argument, they assert that the confiscation was highly relevant to their case because they sought to prove that the police planted a pellet gun at the Sullivan residence on the day Sean was killed, and, by precluding the cross-examination of Officer Harold, the District Court prevented Plaintiffs from impeaching his denial that he had confiscated a pellet gun only two weeks before the fatal shooting.

The primary problem with Plaintiffs' position is, again, a lack of foundation. Plaintiffs were obliged to demonstrate relevance, which on the record here, one could say they did not. Under Federal Rule of Evidence 401, evidence is relevant "if its existence

---

[7] To the extent that Plaintiffs sought to cross-examine Officer Harold regarding his opinion as to the alleged delay between the time that the officer identified the firearm and the time that the discovery was recorded in the dispatch log, that line of questioning was impermissible under Rule 701. Under Rule 701, "testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony …; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rule 701(a) "is essentially a restatement of the personal knowledge requirement necessary for all lay witness [opinion] testimony." *United States v. Stadtmauer*, 620 F.3d 238, 263 (3d Cir. 2010). Accordingly, "[t]he requirement that a lay opinion be rationally based on the witness' perception requires that the witness have firsthand knowledge of the factual predicates that form the basis for the opinion." *Gov't of Virgin Is. v. Knight*, 989 F.2d 619, 629 (3d Cir. 1993); *see United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) ("[A] lay opinion must be rationally based on the perception of the witness. This requirement is the familiar requirement of first-hand knowledge or observation.") (internal quotation marks and citation omitted).

11

simply has some 'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *United States v. Jones*, 566 F.3d 353, 364 (3d Cir. 2009) (quoting Fed. R. Evid. 401)). However, "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). In determining whether the proponent of the disputed evidence "has introduced sufficient evidence" under Federal Rule of Evidence 104(b), "the trial court … examines all the evidence in the case and decides whether a jury could reasonably find the conditional fact … by a preponderance of the evidence." *Huddleston v. United States*, 485 U.S. 681, 689 (1988). The trial court itself does not weigh credibility or make a finding that the proponent of the evidence "has proved the conditional fact by a preponderance of the evidence." *Id.* at 690.

Here, the District Court had reason to understand that Plaintiffs' theory of the case was that the gun found in the Sullivans' backyard on March 31, 2006 was the same gun that was confiscated when police officers confronted Yuetter on March 14, 2006. Thus, in order for Yuetter's pellet gun to be relevant to this case, Plaintiffs had to show that it was the same gun seized the day of Sean's shooting.[8] However, they did not produce any

---

[8] During oral argument, Plaintiffs' counsel asserted that the confiscation of the pellet gun during on March 14, 2006 was relevant because it demonstrates that the police officers had access to a pellet gun on the day that Sean was killed. In other words, according to Plaintiffs' counsel, the fact that the police officers had some access to a pellet gun on March 31, 2006 (even if the gun was different than the one that was confiscated when the officers questioned Yuetter on March 14, 2006) increases the likelihood that they planted a gun at the Sullivan residence when Sean was killed. That was not argued to the District Court. Instead, the position pressed on the District Court

evidence to that effect. The only proffer in fact indicated that, to the contrary, the plastic pellet gun confiscated from Yuetter was a different gun than the metal BB gun recovered from the Sullivans' backyard. Plaintiffs' solution seemed to be to seek, through cross-examination, some evidence to prove the conditional fact upon which the relevance of Yuetter's pellet gun was pinned, i.e., that it was the same gun found in the Sullivans' yard. It was thus no abuse of discretion to say that the proposed cross-examination was speculative and failed the test of relevance in the first instance.

Perhaps, understanding the difficultly with their position on this point, Plaintiffs, through counsel at oral argument, were prepared to concede that their argument for relevance was weak. Instead, they asserted emphatically that, "This is not a case about relevance. … This is a case about impeachment." (Oral Argument at 37:10, Sullivan v. Warminster Township et al. (No. 11-2187), available at http://www.ca3.uscourts.gov/oralargument/ListArguments30.aspx.) But, Plaintiffs' claim that the District Court erred in not allowing them to impeach Officer Harold about the

---

was that the Yuetter gun and the gun from Sean's yard were one and the same, and the record demonstrates that the District Court understood that to be Plaintiffs' theory. Indeed, the District Court made that clear when it sustained Defendants' objection to Plaintiffs' attempt to cross-examine Officer Harold concerning the pellet gun, stating, "[o]ne of the theories of the case is that the gun was planted … but you're trying to prove that on another occasion, this officer found a different gun." (App. at 3013-14.) And, after the District Court made that statement, Plaintiffs' counsel did not articulate the theory that Plaintiffs now assert on appeal – namely, that the confiscation of Yuetter's pellet gun was relevant because it demonstrated that the police officers had access to pellet guns generally. Because there was no reason for the District Court to assume the theory of relevance Plaintiffs now assert, the District Court's understanding of Plaintiffs' argument regarding the relevance of the pellet gun confiscated on March 14, 2006 was entirely reasonable.

13

pellet gun is also unpersuasive because they never described for the District Court the

purpose of their proposed questions.

Indeed, the sidebar conversation Plaintiffs point to as their proffer on

impeachment is anything but clear.[9]  The proffer focused again on whether the pellet gun

---

[9] That following discussion ensued during sidebar:

> [Defendants' counsel]:  Objection, Your Honor.  This is --
> this -- can I see you at sidebar?
> …
>
> [Defendants' counsel]:  This is -- this is about that Bryan
> Ubid (phonetic) that (inaudible) 271 but he used it.  Now
> they're attempting to use it with this witness.
>
> [Plaintiffs' counsel]:  I have no plans on calling Mr. Ubid.
> I'll simply call someone, impeaching -- his testimony is
> essentially I saw the gun, that's how it got there, and my
> cross-examination is going to be, no, it wasn't there.  You had
> an opportunity to -- because you (inaudible).  And in the
> course of the investigation, Sean (inaudible).
>
> [Defendants' counsel]:  Your Honor, this is an attempt to get
> it in through the backdoor.  You take the (inaudible) and the
> combination off the list.  This was already argued sufficiently
> through the -- now they're trying to backdoor that.  They've
> withdraw[n] a motion because there's not enough evidence,
> and now they're going to back door it, and that's the way they
> do it.
>
> [Plaintiffs' counsel]:  But it's not the same --
> [Defendants' counsel]:  It's not the same --
>
> [Plaintiffs' counsel]:  It's not the same.
>
> The Court:  Will you let one speak at a time?
>
> [Defendants' counsel]:  Apologies, Your Honor.

14

[Plaintiffs' counsel]:  I'm not -- it's true that we withdraw the -- (inaudible).

The Court:  Well, tell me this.  This witness has said he did not recover a

[Plaintiffs' counsel]:  His documents won't prove as well.

The Court:  Well, tell me what the documents say.

[Plaintiffs' counsel]:  Officer Harold, Lieutenant Springfield, Mr. Outland --

[Defendants' counsel]:  (Inaudible).

The Court:  It's a different gun, a different length?

[Defendants' counsel]:  Yes.

[Plaintiffs' counsel]:  We can talk about it.

[Defendants' counsel]:  He's trying to bring it (inaudible).

The Court:  Well, why do you have to be able to do it, Mr. McSwain?

[Plaintiffs' counsel]:  Because --

The Court:  You have --

[Plaintiffs' counsel]:  -- this is one of the theories of the case.

The Court:  One of the theories of the case is that the gun was planted --

[Plaintiffs' counsel]:  Yes.

The Court:  -- but you're trying to prove that on another occasion, this officer found a different gun.

[Plaintiffs' counsel]:  I don't think it necessarily was a different gun but they can question him as to that.

15

confiscated on March 14, 2006 was the same gun that the officers took from the

Sullivans' yard. While a very generous, after-the-fact reading of the record might

support Plaintiffs' contention that they sought to introduce the disputed testimony for the

purpose of impeachment by contradiction, (*see* App. at 3013-14), a fair reading of the

colloquy is that the District Court was being presented once more with the "it's the same

gun" argument, and the Court was not accepting it. In short, because the Plaintiffs never

adequately communicated to the District Court their desire to impeach Officer Harold

regarding the confiscation of Yuetter's pellet gun, we cannot say that the District Court

abused its discretion in limiting the scope of cross-examination.[10] *See Old Chief v.*

---

        The Court: Sustained.

(App. at 3013-14.)

[10] We also note that, in light of the evidence adduced at trial, one may wonder whether impeachment of Officer Harold's testimony regarding the confiscation of Yuetter's pellet gun would have had any effect on the jury's verdict. As previously noted, when Plaintiffs' counsel asked Officer Harold whether he confiscated any "black pellet guns" during his investigation of the Warminster robberies, he replied that he did not confiscate any "bebe pistols" prior to March 31, 2006. Officer Harold's answer to the question posed by Plaintiffs' counsel was, at best, unresponsive, particularly since the record demonstrates that Harold was present when a police officer confiscated a "black plastic HFC pellet gun" on March 14, 2006. Nevertheless, it is unclear how his answer would so tarnish his credibility that it would change the jury's overall assessment of the evidence. Plaintiffs' theory of the case hinged on the assertion that Sean did not have a gun when he exited the Sullivan residence and ran towards the back fence. That theory was supported by the eye-witness testimony of the Sullivans' neighbors, Robert and Kelly Franks, who stated that Sean did not have a gun when the police officers fired at him. The jury, however, believed the testimony of two police officers who stated that Sean pulled a gun from his waistband when he landed on the ground after exiting the back window of the Sullivan residence. The jury also, apparently, credited the testimony of a third officer who stated that Sean fired a pistol at the police officers as he ran toward

16

*United States*, 519 U.S. 172, 182 n.6 (1997) (noting that "[i]t is important that a reviewing court evaluate the trial court's decision from its perspective when it had to rule and not indulge in review by hindsight.").

## III.    Conclusion

For the foregoing reasons, we will affirm the District Court's order.

---

the back fence.  Given the jury's decision to reject the powerful testimony given by Kelly and Robert Franks, which directly contradicted the testimony of the police, one might well conclude that it is highly probable that Officer Harold's evasive response, even if highlighted by effective impeachment, would not have affected the outcome of the case. *See Walker v. Horn*, 385 F.3d 321, 334 (3d Cir. 2004) (standard of review for non-constitutional error allows a finding of harmlessness "if it is highly probable that the error did not affect the outcome of the case.").